Robert Jaeschke, Plaintiff in Error, v. Auguste Reinders,
Defendant in Error.

May 16, 1876.

1. A court of equity will not interfere to set aside a conveyance of a rever-
sionary interest, on the ground of inadequacy of consideration, where
there has been no fraud or concealment, where the party selling is a man
of ordinary intelligence, and where the consideration is not so inadequate
as to shock the moral sense.

2. In the case of a sale by expectant heirs and reversioners, the ground of the
protection extended by courts of equity is the distress of the heir or person
dealing with his expectancy, and the pressure brought to bear on him.
While this continues he is regarded as an infant; when it is removed, the
infancy is determined; where it does not exist, the doctrine has no appli-
cation.

Error to St. Louis Circuit Court

*Affirmed.*

*Hitchcock, Lubke & Player*, for plaintiff in error, cited :
Tison *v.* La Beaume, 14 Mo. 198 ; Stevens *v.* Spiers, 25
Mo. 386 ; Kerr on Fraud, 95 ; Havenden ón Fraud,
105 ; White & Tudor Ld. Cas. 151, 152 ; Carter *v.* Ashire,.
48 Mo. 300 ; McCormack *v.* Malin, 5 Blackf. 509 ; Shelly
*v.* Nash, 3 Madd. Ch. 127.

*A. J. P. Garesché*, for defendant in error, cited : Kerr
on Fraud (1st ed.), 186 ; Holmes *v.* Fish, 9 Mo. 211 ;
Chouteau *v.* Nuckolls, 20 Mo. 447, sec. 5 ; Parker *v.* Hanni-
bal & St. Jo. R. R. Co., 44 Mo. 421 ; Cadwallader *v.* West,
48 Mo. 494 ; Wagner *v.* Phillips, 51 Mo. 117 ; Durfee *v.*
Moran, 57 Mo. 379 ; Glasscock *v.* Minor, 11 Mo. 657 ;
Buford *v.* Caldwell, 3 Mo. 335 ; Holland *v.* Anderson, 38
Mo. 59 ; Soulard *v.* Peck,.49 Mo. 479 ; Parmelee *v.* Came-
ron, 41 N. Y. 392.

Bakewell, J., delivered the opinion of the court.

This is a proceeding to set aside a conveyance on the
ground of fraud.

The petition is filed on February 20, 1874, and alleges
that, in May, 1869, one J. H. Koppelman died in St. Louis,

leaving an estate there worth about $75,000, and, by his last will, devised and bequeathed all his estate to his widow, Anna, for life, and, as to the remainder, devised one-half absolutely to his adopted daughter Johanna; that the widow, as executrix, made final settlement of the estate, and afterwards intermarried with defendant; that there were no debts, and the whole estate remained in the hands of the widow; that plaintiff is the father of Johanna, the adopted daughter of Koppelman; that she died in 1872, a minor, without issue, leaving as her sole heirs plaintiff and three brothers, still minors, and all living; that, upon the death of his daughter Johanna, plaintiff became entitled to one-eighth of John H. Koppelman's estate, subject to the life estate of the widow; that said eighth is worth about $10,000; that plaintiff removed to Kansas many years before the death of Koppelman, and, up to the time of his execution of the deed which he seeks to set aside, did not know of his daughter's death, or of the death of Koppelman, nor did he know anything of the character or value of Koppelman's estate, nor as to what interest plaintiff had in it; that, about December 12, 1873, defendant having, by marriage with the widow, obtained control of Koppelman's estate, devised a plan to cheat plaintiff out of his interest therein, and, having ascertained his address, employed one Devereux to buy plaintiff's interest therein for an inadequate consideration; that Devereux sent a message requesting plaintiff to meet him at a hotel, in Lawrence, and, in pursuance of this fraudulent design, informed plaintiff of the death of his daughter, and of Koppelman's death; told him that the estate was of no great value—consisting of four lots in St. Louis—and said that Koppelman had devised one-half of this property to plaintiff's daughter, on condition that she should reach the age of twenty-five years; that Koppelman's widow was married to defendant; that plaintiff had no interest in the estate, but that defendant would give plaintiff $500 for any possible interest he might have in the estate, and urged plaintiff to accept the offer; that plaintiff

asked time to reflect and inquire as to the value of the property, but that Devereux insisted upon an immediate answer, and that plaintiff, relying upon Devereux, whom he knew, accepted the $500, and executed, acknowledged, and delivered a deed of all his interest in any property of which Koppelman died seized or possessed, which deed was recorded ; that defendant knew plaintiff's ignorance of the value of this property, and that the whole transaction was fraudulently contrived by defendant to cheat plaintiff ; that the consideration paid was wholly inadequate ; that plaintiff first awoke to a sense of what he had done when friends in St. Louis, seeing the deed noticed in an abstract of recorded conveyances daily published in St. Louis, notified him that he had sacrificed his interests, upon learning which he at once proceeded to St. Louis and saw defendant, who acknowledged the fraud, and, at first, offered to repair it, but afterwards refused to do so ; that plaintiff then tendered defendant $500, and asked him to cancel the conveyance, which was refused. Plaintiff prays for a decree declaring the deed void on payment to defendant of $500.

The answer of defendant admits that Johanna Koppelman was the natural daughter of plaintiff, and says that, on March 26, 1866, he surrendered all his parental rights over her to the deceased J. H. Koppelman, who adopted her, by deed, under the laws of Missouri, and always treated her as his child, having changed her name from Jaeschke to Koppelman ; admits the death of Koppelman, and the will, and the intermarriage of defendant and Koppelman's widow, and that defendant employed Devereux to acquire any interest defendant might have or claim in the estate of Koppelman ; denies that the estate of Koppelman was of the value alleged ; and denies the inadequacy of the consideration paid him, and all the statements of the petition as to fraud, misrepresentation, or concealment, and as to conversation between defendant and plaintiff after the deed was executed.

On hearing, the bill was dismissed ; and, a motion for a

new trial having been overruled, the cause is brought before us by writ of error.

On the trial defendant's counsel moved that the witnesses be separated by being excluded from the court room until called to testify. To this plaintiff objected, and the witnesses for plaintiff were then all sworn and sent out of court, to remain away until called. Counsel for plaintiff then inquired whether defendant proposed to testify, and, upon learning that he did, moved to exclude him from the court room whilst plaintiff's witnesses were testifying. This motion was overruled. Exceptions were duly preserved to this action of the court, but we do not see that it is to be complained of. The plaintiff himself was not present; his testimony was offered in the shape of a deposition. It is discretionary with the court trying the case whether the witnesses shall be separated during the trial, so as not to hear each other's testimony; and we see nothing which leads us to believe that discretion was improperly exercised in this case. Had plaintiff been in court he would probably not have been excluded; at any rate, he was not excluded; and we do not think that the court was bound, because it had, at the instance of defendant, separated the witnesses for plaintiff, to send the defendant himself out of court during the trial of his case. His suggestions to his counsel during the trial would probably be of great value. That the plaintiff himself was absent was a circumstance over which neither the court nor the defendant had any control; and there is no reason why it should have been allowed to deprive defendant of the right to sit beside his counsel during the trial of his cause.

The evidence in the case shows that plaintiff is a watchmaker, living in Topeka, Kansas, having three sons, whose ages range from fifteen to nine years, and who are all living away from their father. In 1866 he resided in Lawrence, and there, by deed, surrendered to John H. Koppelman all parental rights over his only daughter Johanna, who was

then adopted, under our statute, by Koppelman, whose name she took. From that time plaintiff never inquired about his child, and never saw her again. Koppelman died in 1869, and left an estate which one witness values at $80,000, of which nearly one-half was personal property, the remainder real estate. By last will he left all he had to his wife, for life, "on the express proviso," as the will says, "that she will be a mother indeed for our adopted daughter, Johanna, six years old; that she will bring her up and educate her according to her best means." After the decease of his wife one-half of the property was to be given to Johanna, "provided she be a good girl," and the other half to go to the heirs of the testator and his wife. The widow, Anna, was executrix of the will, took possession of the property, and settled the estate. In 1872 Johanna died, aged about nine years, and, a few months afterwards, Koppelman's widow married defendant. On November 20, 1873, one year after her marriage, all the right, title, and interest of the widow was, by deed of her new husband, Reinders, and herself, conveyed to one Eugene D. Garesché, who, by deed of the same date, conveyed the same to Reinders. On November 26, 1873, Alexander J. P. Garesché, attorney for Reinders, addressed to Judge Devereux, an attorney of Lawrence, Kansas, and at that time land commissioner of the Kansas Pacific road, the following letter:

"St. Louis, Mo., 30th November, 1873.

"Hon. Judge Devereux, Counselor at Law, Lawrence, Kansas:

"Dear Sir: I inclose to you, 1st, certified copy of the will of John H. Koppelman, as here duly probated, calling your attention to the 4th and 5th clauses; 2d, articles of adoption of Johanna Jaeschke, daughter of Robert Jaeschke, by said Koppelman, as copied from records of St. Louis county, bk. 309, p. 520. I also call your attention to the statutes of Missouri concerning the adoption of children. See Wagner's Statutes, p. 256, ch. 28. It is the counter-

part of the act of 1857. Sess. Acts, p. 59. I call your attention particularly to the 4th clause, and these concluding words: 'This provision (and which gives to the child as against its adopted, the same rights as against its natural parents) shall not be extended to other parties, but is wholly confined to parties executing the deed of adoption. Now, Mr. Koppelman being dead, and the adopted daughter having died intestate, unmarried, and without issue, what becomes of devise to her? I say it is vested, and hence descends to her heirs. But who are these? If she came from the loins of Mrs. Koppelman, under our laws she would be sole heir. But, if it was of Jaeschke's estate, Johanna could inherit of her natural father's estate. Why, then, should not her brothers and sisters inherit from her, particularly under 4th clause of the law? Mrs. Koppelman has remarried one Auguste Reinders, my client. I have advised him to buy in the interest of the father, Mr. Jaeschke, who lives in Lawrence, if it can be bought cheaply. We wish you to see him, and ascertain if it can be had. Mr. Reinders would authorize you to offer five hundred dollars for it. Retain inclosed papers, that they may be returned to me. Jaeschke is, I believe, a watchmaker.

"Present my best wishes to your wife, and believe me to be, most truly, yours,          ALEX. J. P. GARESCHÉ."

This letter appears to have been received in due course of the mail, together with the inclosures.

On receiving the letter, Judge Devereux made inquiries for Jaeschke, and found he had removed to Topeka. He then wrote to Garesché to send on a form of deed, and made an appointment with Jaeschke to meet him on December 10th, at the McMeekin House, Topeka.

The form of deed sent on by Garesché began with a preamble setting forth Koppelman's death, and that by will he had devised to his wife the usufruct of all his estate, real and personal, for life, and, upon her death, one-half to Johanna, his adopted daughter, and one-half to his right

heirs; that Johanna was the natural daughter of Jaeschke, born in wedlock, but surrendered to Koppelman by deed of adoption; the death of Johanna, intestate and without issue, a minor; that the questions arise whether the estate devised to her be vested, and if vested, whether it descends to her heirs by blood or those by adoption, and, if the former, that Jaeschke is entitled, and that Reinders married the widow. The deed, in consideration of the recitals and $500, conveys all and every right, title, claim, and demand of Jaeschke, of, in, and to the moneys, debts, dues, claims, choses in action, and demands of the estate of John H. Koppelman, deceased, and also the realty, which is particularly described, and subrogates Reinders to all rights and interests of Jaeschke in and to the estate of his daughter Johanna.

Devereux knew Jaeschke by sight, having once or twice had a watch repaired by him when he lived in Lawrence, but did not know his name or have any other dealings with him before acting for Garesché in this matter. On December 10, 1873, Devereux went to Topeka with Garesché's letter, the unexecuted deed, the copy of the will and of the deed of adoption, and met Jaeschke there by appointment. The statements of Jaeschke and Devereux as to what passed between them do not exactly accord; but, where they differ, no hesitation will be felt in giving credence to Devereux, as his statement is straightforward and consistent, whilst Jaeschke manifestly prevaricates as to some circumstances of which we will speak hereafter. The interview took place in the parlor of the McMeekin House, and lasted somewhat more than an hour. When Devereux got down from the cars, Jaeschke came up and said he was the man Devereux was looking for. Of what followed Devereux gives the following account:

"I told him I came to see him because I had received a letter from Mr. Garesché, a lawyer of St. Louis, and a personal friend of mine; that I would read it to him; and I

did read the whole of it, except the portion which author-
ized the offer of $500 for his interest in the Koppelman
estate, and which begins with the word ' we ' and concludes
with the signature. Jaeschke seemed to learn for the first
time of the death of his child. I also read to him what pur-
ported to be the copy of the will of Koppelman, and may
have also read the article of adoption. He invited my opin-
ion of the matter, but I suggested he should consult his
friends; that I was acting for Garesché, the lawyer of
Reinders. He inquired what they would give; I at once
told him $500; he hesitated a little, and said he would take
it. If I could have then obtained the presence of a notary
I should have concluded the business; but it was too late at
night, and I had to return to Lawrence. I suggested that
he should come and see me in a day or two; that I should
leave on the early train. He said he would go with me, and
we parted. Next morning we came to Lawrence together.
About eleven o'clock A. M. of that day he came into my office,
intoxicated, whilst I was transacting some business with Mr.
Gilmore, my secretary, and I said to him I would transact no
business with him in his then condition; if he could return
sober I would conclude the matter. I saw nothing more of
him till next day, when he came, and I reread the deed,
also Garesché's letter; then went to the office of Bemis, a Ger-
man notary, with him. Bemis was out; I then went to Mr.
Sinclair's, who took the acknowledgment. Returning to my
office, I called in Mr. Gilmore, and, telling him what I paid
it for, gave him $500 to count and pay to Jaeschke.
Jaeschke followed me into my private office and wanted to
pay me for my services, which I refused. To the best of my
impression, I read the copy of the will to Jaeschke, and then
handed it to him to read. Garesché's letter was very diffi-
cult to decipher, and I did not hand him that, for that
reason; I read it carefully to him, the whole of it, except
as stated. I have no knowledge of the value of the estate,
except from the letters and papers sent me as stated. I said

nothing at all about what he ought to take; I purposely refrained from any language that would influence him in the least. I did this as due to myself and to my friend Garesché. On the contrary, I advised him to confer with his friends. I read every word of the deed to him before he executed it. I know that I said nothing whatever to him as to the age at which Johanna would enter into the estate; I said nothing whatever on that subject, further than reading him the will. I know neither Reinders nor his wife; never heard of them, except through Garesché's letter. I handed the copy of the will and deed to Jaeschke to read; he invited my opinion, but I said I would give him no advice; that I knew nothing of the laws of Missouri as to an adopted child. I reminded him, also, that Garesché was Reinders' lawyer, and that he had better consult his friends. He said he never expected anything from Koppelman's estate, or that he had no claim on it, or words to that effect. I have no recollection whatever of his saying he had no friends in Topeka to consult. I never suggested he had better take $500 or he might have no interest in the estate. He returned to Lawrence with me at his own suggestion; I told him to come in a day or two, but he said he would go with me. I am sure I read him the papers and the letter as I have stated.''

Jaeschke swears : ''We went up into the parlor. I told him I had three other children besides Johanna. To his question if I knew anything of Koppelman's estate I said I had heard nothing of it since 1867. He asked if I knew I inherited anything from my daughter; I replied that the gentleman to whom I had given her had, at the time, considerable wealth. I inquired what were my chances of inheritance from her; he said he could not give me much advice about that—to take anything I could get for it. He read to me three papers. One, extracts from Koppelman's will in regard to my daughter; next, what property Koppelman left, and I remember it was a number of lots. To my

question if this was all he left, Devereux answered he did not know; that he was acting for Garesché, who represented defendant; that the best thing I could do would be to take $500 for any interest I might have. I asked time to consider, but he thought we had better fix it up right off. I wished to postpone it a few days; but he advised I should go down to Lawrence and get done with it at once. I remember Judge Devereux told me that the four lots were all the property Koppelman owned, and that the will gave my daughter the property only when she attained the age of twenty-five years; that the estate was of no great value, and I had no legal interest. I had no information except his statements. By them I was induced to sign. On January 29th I received a letter from Schmertmann that the estate was worth $80,000, of which, after a time, I would have one-half. In February, 1874, I went to St. Louis with Schmertmann, and asked defendant to take back the $500 and return the deed. He told me he could do nothing in the matter, but would, if Garesché consented. I made the same offer to Garesché. He said I was a fool to come to him with such a proposition, and had better go home. Next day I called on defendant with Schmertmann; he said, if I was wronged he would wish to right me; but if I preferred to go to law, I had better do so. Judge Devereux did not read me the will, but only the clause of it that, after twenty-five years, the property should be divided between mother and daughter, provided she was a good girl. I don't know whether I was drunk or sober on the morning of December 13th, when I was in Lawrence. I did not go to Devereux's office on the 13th, but on the 14th. He read me the deed; asked me if I was satisfied. I said I was, and signed it. I don't know whether Devereux turned me off on 13th because I was drunk. On the night of the 12th I was with him an hour or so; then did not see him till the 13th, when I did not talk with him, and between the night of the 12th and morning of the 14th I had nothing to do with him."

The statement of Judge Devereux that Jaeschke came drunk to his office, on the 13th, was sent away on that account, and returned and concluded the matter when sober, on the 14th, was corroborated by two witnesses.

Defendant Reinders denied that he ever said to plaintiff that he would right him if he had done wrong, and said he simply referred plaintiff to defendant's lawyer.

One John H. Koppelman testified as to the value of the property, and no other testimony was introduced on that subject. He also swore that defendant told him that the deed to Eugene D. Garesché was made to induce plaintiff to sell out more cheaply; but in this he is contradicted by defendant. As the reconveyance to Reinders was, confessedly, at once made and recorded, it is difficult to see what effect this could be supposed to have.

There was no other testimony in the case of any importance whatever.

It will be admitted that, conceding Jaeschke to have had an interest of one-eighth in the real estate owned by Koppelman at the time of his death, subject to the life estate of Mrs. Reinders, and also an interest of one-eighth in so much of the personalty of the estate as might be left undisposed of at the date of Mrs. Reinders' death, $500 was an inadequate consideration for this purchase. But it is extravagant to contend, as is done by counsel for respondent, that the value of the interest sold was one-eighth of $80,000, the total value of the estate. The whole estate was worth $80,000. Of this one-half is personalty. Let us suppose that, at the death of Mrs. Reinders, the whole estate remains wholly unimpaired, and not depreciated in value. Mrs. Reinders, at the date of the sale, was forty-three years of age. She was younger than Jaeschke, and would probably outlive him. Her expectation of life was twenty-five years, by the Carlisle tables. Now, the purchasing value of an absolute certainty of $10,000 in cash, to be paid on the death of a person aged forty-three, is not $10,000, but that sum which, placed at interest for twenty-five years, will

produce $10,000 at the end of this period.   But $4,000, at simple interest at the rate of 6 per cent., will produce $10,000 in twenty-five years; and if the rate be fixed at 10 per cent., and the interest compounded annually, the sum of $1,000 will produce nearly $11,000 in the same period of time.

Many men might be very glad to get $500 for such an expectation as this, and, as the courts cannot and will not make bargains for men, in the absence of misrepresentation or abuse of confidence properly-reposed, and where the parties are quite competent to contract, the courts will not interfere.

Jaeschke had, long before, resigned all parental rights over, and claims to, his daughter.   He cared so little about her that he had never asked whether she was alive or dead; and, though he had a correspondent in St. Louis, did not know of her death till told of it by Devereux, years after it occurred.   He knew that Koppelman was a rich man. He did not know, nor do Devereux, Garesché, or Reinders appear to have been clear, whether he really had, or not, any interest in Koppelman's estate, as heir of his daughter. They seem all to have thought that, by deed to Koppelman, Jaeschke relinquished all rights and claims as a father.   He had every opportunity of taking legal advice, or of setting on foot any examination as to the facts of the case.   No misrepresentations whatever were made.   This cannot be said to be " such a bargain as no man in his senses and not under a delusion would make, on one hand, and no honest and fair man would accept on the other," as was the case in *Dunn* v. *Chambers*, 4 Barb. 378.

We do not think that there was here any such inadequacy of consideration as shocks the moral sense, and the conveyance cannot be set aside on that ground unless the rule contended for by counsel for respondent be correct— that no purchase of an expectant interest in an estate will be upheld unless it be shown that the consideration paid

was entirely adequate. We do not think that such is the rule; nor do we think that the case at bar falls within that class of cases in which courts of equity have interfered, from principles of natural justice, to protect heedless and necessitous persons from the calculating rapacity of unconscionable relatives, or to guard against the improvidence which leads the young, and rash, and the dissolute to sacrifice the future for the present.

There is nothing persuasive in the circumstances of this case. Jaeschke had no sort of claim upon Koppelman, and it is not probable that Koppelman ever dreamed that Jaeschke would be enriched by his earnings, and that the consequence of the adoption of Johanna would be that one-half of Koppelman's estate would go, on the death of Koppelman, to entire strangers. Jaeschke is no young, eager, and imprudent heir, tempted to his ruin by an unscrupulous uncle, a greedy and dishonest executor, or a speculating stranger to a rich estate. He is a father who has, by a solemn instrument, conveyed away, so far as he can do so, all rights over, and interest in, his child. The cases cited to establish the universal rule which counsel would have us establish—that no purchase of an expectant interest can ever be upheld unless complete adequacy of consideration be shown—are cases of a very different character from the one at bar. "The whole doctrine of courts of equity with respect to expectant heirs and reversioners, and others in a like predicament, assumes that the one party is defenseless, and is exposed to the demands of the other under the pressure of necessity. It assumes, also, that there is a direct or implied fraud upon the present or other ancestor, who, from ignorance of the transaction, is misled into a false confidence in the disposition of his property." This is the language of Judge Story. So Lord Brougham says, in *King* v. *Hamlet*, 2 Myl. & K. 473: "The whole ground of the doctrine is the pressure on the heir or the distress of the party dealing with his expectancies. While he con-

tinues under that pressure, as Lord Thurslow said, the law treats him as an infant. But the infancy is determined when the pressure is removed.''

Even in regard to the more modern English rule as to the power of equity to relieve expectant heirs and reversioners from disadvantageous bargains—the principle and policy of which is seriously questioned by very grave authorities, as tending to throw this class of persons into the hands of sharpers—Mr. Swanston, who carefully collates the cases, says it may be doubted whether, to constitute a title of relief, the reversioner must not also combine the character of heir.

The respondent was certainly not an heir, in the sense in which that word is used by the English chancellors. He is not shown to have been under any stress or necessity; no pressure was brought to bear upon him; he had notice that the estate in question was that of a wealthy man; he was not himself an especially ignorant man, and he was in the prime of life. We cannot see why he should not be held, under the circumstances of the case, perfectly competent to make such a contract as this.

The judgment of the Circuit Court was, therefore, one which that court might rightly give under the circumstances, and which we cannot reverse. It is accordingly, with the concurrence of all the judges, affirmed.