# NEOMA EMBREY v. LAFE BORDEN et al.

Springfield Court of Appeals, January 29, 1923.

1. **DESCENT AND DISTRIBUTION**: Burden of Establishing Defense of Fraud on Defendant Seeking to Set Aside Conveyance of Curtesy. Where defendant alleged that quitclaim deed to his daughters conveying his interest in his wife's estate was obtained by fraud, the burden was upon him to prove such defense where there was no evidence of any special trust relations existing between father and daughters with reference to the property involved.

2. **ASSIGNMENTS**: Allowance to Widower Subject to Assignment. A widower's right to statutory allowances from his wife's estate and allowance for household goods was subject to assignment by his quitclaim deed subsequent to his wife's death.

3. **DESCENT AND DISTRIBUTION**: Conveyance of Curtesy not Invalid for Inadequacy of Consideration. Mere inadequacy of consideration is insufficient to warrant a court of equity in setting aside a deed executed by a widower to his daughters conveying his curtesy rights in his wife's estate where the parties were competent to make contracts, and no special trust relation existed between them.

4. ———: **Evidence Held Sufficient to Disprove Fraud in Conveyance of Curtesy.** Evidence *held* sufficient to require a finding that quitclaim deed to widower's curtesy rights had been read to defendant and thoroughly understood by him, thus precluding his contention that deed was obtained by fraud.

Appeal from the Circuit Court of Newton County.—*Hon. Chas. L. Henson,* Judge.

REVERSED AND REMANDED (*with directions*).

*Hubbert & Hubbert* for appellants.

*Leo H. Johnson* for respondents.

FARRINGTON, J.—Neoma Embrey, Ida M. Myers, Geneva Pipkin and Lola Harrison, four sisters, brought this bill in equity against their father, Tom Marshall, and Lafe Borden, the executor of their mother's estate. Their bill seeks to have it decreed that they are the lawful owners, by assignment, of all the rights and claims of their father against the estate of their deceased mother, wife of Tom Marshall, and prays that the defendants be enjoined and restrained from proceeding in the probate court so as to impair their claimed rights as assignees of Tom Marshall.

The defendant Borden, executor, answered stating that he believed the allegations of the bill were true but submitted the matter to the court for determination. Defendant Tom Marshall answered first by general denial, and then by way of affirmative relief set up the facts as to his being the husband of Martha G. Marshall, deceased; that by her last will she bequeathed to him and to the wife and children of B. C. Marshall, a deceased brother of the plaintiffs, each the sum of One Dollar; that she bequeathed to her four daughters, the plaintiffs

herein, all of the remainder of her estate, consisting of real and personal property.

The answer of Tom Marshall further alleges that the wife of B. C. Marshall instituted a partition suit claiming an interest therein for herself and children in some real estate which was left by Martha G. Marshall, and which real estate was the subject of a quitclaim deed hereinafter to be mentioned, and which plays an important part in the main question to be decided in this suit. While this partition suit was pending there was a question raised concerning the curtesy rights of Tom Marshall in this real estate, and it is around the acquisition of this curtesy right and the rights which Tom Marshall had in his deceased wife's estate that this law suit revolves. The defendant Tom Marshall alleges that while this partition suit was pending he was living with one of his daughters, Mrs. Embrey, and that she and another daughter, Mrs. Pipkin, induced him, in consideration of certain property conveyed to him, to execute a quitclaim deed to the land which was in litigation in the partition suit. It is admitted that he executed a quitclaim deed to this real estate to these plaintiffs in consideration of a $400 note, payable to him, made by the plaintiffs, which was paid to him prior to the institution of this suit; the turning over to him of a note of about $92, which was held by the executor of the estate of Martha G. Marshall but claimed by the defendant Tom Marshall, and a quitclaim deed to him by the plaintiffs herein of a one-fifth interest in and to fifteen acres of land, the value of which defendant says was about $100 and plaintiffs say that in making the trade with him for the quitclaim deed that he valued it at $300.

The defendant Marshall testified that he wanted $800 for his curtesy right in the real estate which was conveyed by him in the quitclaim deed; and further testified that he made the quitclaim deed in consideration of the $400 note, the $92 note and the quitclaimed interest in the fifteen acres which the plaintiffs deeded to him;

and he alleges and testifies that all he was selling to his daughters for what he was getting was his curtesy right in and to this real estate which was involved in the partition suit. The quitclaim deed, however, contained not only a description of the land aforesaid but also contained this provision following the description of the land: "Together with all the right, title, interest and claim that I, the said Tom Marshall, have or might have in or against the estate, personal, real or mixed, or any property of effects, of the late Martha G. Marshall, deceased, whether under the law or by will of said deceased, who was my wife." It is this last quoted clause in the quitclaim deed made by him that he alleges was procured by fraud and deceit, and in his answer he asks that that provision of the quitclaim deed be declared null and void on account of it having been procured by fraud practiced on him by his daughters. We may add that for sometime after this deed was made and filed, in fact a considerable time afterwards, nothing was done by him with reference to claiming anything further in his wife's estate, but before the time had elapsed in which he could do so, he renounced the will of his wife and claimed $400 as a widower's allowance, $600 in lieu of sustenance and support for the first year, and $350 for the household goods and furniture. All of the three claims were allowed by the probate court over the protest of these plaintiffs; and after the allowance of the same by the probate court the matter was appealed to the circuit court, where it was pending at the time this bill in equity was filed by the plaintiffs herein. The defendant offered to return the $400 and the value of the three acres which had been deeded away by the plaintiffs in consideration of the quitclaim deed which defendant Marshall had executed.

The court, after hearing all of the evidence, entered a decree in favor of the defendant Tom Marshall, and made a finding therein that the alleged assignment made by him in the quitclaim deed was fraudulent and void,

and that that provision of the deed which affected the said Tom Marshall's interest and claim in the personal estate of his deceased wife be null and void. It is from this decree that the appeal is brought to this court.

While a number of questions are raised and discussed in the briefs of counsel, there is but one crucial question to be decided and that is, whether the provision in the quitclaim deed heretofore quoted, purporting to assign to the plaintiffs herein the rights and claims of Tom Marshall, the husband of Martha G. Marshall, deceased, in and to her estate is valid. It is undisputed that the conveyance was made, and if fraud was practiced upon him in the procurement of the deed with that provision in it, the decree of the trial court should stand. On the other hand, if there is insufficient evidence to support a finding of fraud on the part of these plaintiffs, then the judgment, irrespective of all other questions in the case, should be reversed. We will, therefore, turn our attention to the evidence bearing on this point in order to see just how that issue is to be decided.

To begin with, of course, the burden is on the defendant Marshall to establish the fraud as it is upon that ground he asks affirmative relief. His testimony is to the effect that he was led to believe by his two daughters that his supposed curtesy right in the real estate involved in the partition suit was interfering and hindering in the procurement of a proper price for same under the sale, and that after much persuasion on their part he finally consented to make a quitclaim deed merely conveying to them for the consideration hereinbefore named his curtesy right in the land. The testimony shows that he is old, afflicted with rheumatism, crippled and has very poor eye-sight. He testifies that the deed was handed to him by his daughter and explained by her as being merely a conveyance of his interest in the real estate, and that he was unable to read the deed over owing to his defective eye-sight and inability to read what he terms as a running hand, the deed having been written

with a pen by the attorneys for the plaintiffs. He also testifies that this was first mentioned to him one evening, and that his two daughters, Neoma and Geneva, prevailed on him to execute the deed until the afternoon of the next day when he went in a conveyance with them several miles to a Notary Public who took his acknowledgment to the deed. He testifies pointedly that neither the Notary Public or any one else read the deed over to him, and that all who spoke to him concerning the deed informed him that it was merely a conveyance of his curtesy right in the land and did not affect any interest he might have in the personal estate of his deceased wife. With such a showing, together with his inability to read on account of his defective eye-sight, a court of equity would be thoroughly justified in granting him the relief prayed for, but his is not the only testimony in the record before us. His two daughters, Neoma Embrey and Geneva Pipkin, testified that their father was the one who proposed that he should have something out of the estate and demanded that they buy him out. That they agreed to buy him out, and had their attorney prepare the quitclaim deed referred to so that his whole interest in the estate might be settled up by a purchase from him of that interest and the execution of such deed, and that it was finally agreed that he would execute this instrument with the provision as to the personal estate in the deed in consideration of receiving a $400 note signed by them and the further conveyance by them, by quitclaim, of an interest in the fifteen acre tract, and the turning over by the executor of a $92 note which was held by him as property of the estate. Their testimony further shows that it was agreed at that time that their father would spend his time with the four sisters, equally, in their homes, and it is admitted that right after the execution of the deed he did begin to visit his various daughters and stay at their homes, and a number of months went by before he undertook to renounce the will of his deceased wife and lay claim to personalty through the widower's allowance,

maintenance and household-goods claims. These two daughters who were with him when the deed was executed testified that he had the deed handed to him and that he apparently read it over and said that it was all right. It was testified that one of them read the deed to him and explained it to him. These two daughters testified that they took him in a conveyance to a Notary Public by the name of Shelley, who lived several miles from their home, and that he executed the deed in his presence. All of the witnesses up to Shelley who testified on the question of fraud and deceit are interested parties, but his testimony stands out in direct contradiction to defendant's testimony. There is no attempt to impeach him in any way, and on the cold printed record, which is the only way an appellate court can judge of the testimony, we must say that it has the ring of truth. We herein set out his testimony which bears directly on the point to be decided here which is, did Marshall know that the provision in this deed which conveyed his whole interest in his wife's estate was contained in the deed at the time he executed it, and this testimony of the unimpeached Shelley, the Notary Public, clearly shows that he did know it. His testimony is as follows:

"My age is sixty-seven; I live at Rocky Comfort; I have been there in all about thirty years; I am a Notary Public, and have been acting for a good many years as a Notary Public; I recall the circumstance of taking the acknowledgment of a deed in the month of October, 1919, to which Thomas Marshall was a party; yes, sir, I remember; I had known him for years he and I went to school together; I had known him for a number of years.

"I will call your attention to a deed that purports to have been certified by you, and ask you if that is the deed you refer to from your memory? A. Yes, sir, I think that is the deed.

"Q. Mr. Shelley, tell the court whether this deed is in the same condition in which you certified it, with the ex-

ception of the marks and certificates of its having been filed and recorded since then? A. Well, as far as I remember, I think it is exactly as it was with the exception of the recorder's certificate on it at the time of the filing; how long had I known the plaintiffs in this case, Marshall's daughters? I really couldn't tell; it has been several years, quite a while; just after the close of the Civil War. Tom and I went to school at Newtoma together; they were with him the day this acknowledgment was taken, two of the daughters along with him, I think at the time the acknowledgment was taken it was just two of them; I am not just positive—I am confident it was two, if not more; but I think just two. What did I do and what did Marshall do with regard to the reading, signing and acknowledging of this paper? Well, those folks came up there and told me that they had an acknowledgment that they wanted taken, that their father wanted taken; and after some remarks I spoke to Mr. Marshall and said: 'You want me to take an acknowledgement of this paper?' and he said, 'Yes,' and I said, 'Do you understand this deed that you are making?' He says, 'Yes, I understand it,' and I said, 'You want to sign it, do you,' and he said, 'Yes, sir;' and I kind of scanned over it and saw that there was a condition to that deed that wasn't to all deeds; that last part of that deed isn't on every deed; the description, that addition of that personal; yes, sir, it was in that deed, at the time; and I said to Mr. Marshall 'Maybe I had better read that over to you,' and finally I read the deed over to Tom, that he might understand that last part. I saw that in there, and I knew that it was something that did not come up in every deed, and I didn't know whether he understood it, and I read that deed over to Tom, and he said, 'That is all right, that it just the way I want it, and that is the way I want to sign it,' and I said, 'If that is the case it is ready to sign whenever you get ready to sign it,' and so Tom signed the deed right there in my presence, just the way it is now, as far as I remember it, except the writing right at the top, that little corner up there.

"THE COURT: That is the stenographer's mark that he put on there just now.

"THE WITNESS: That is all right, and that is the way the deed has been, with reference to the acknowledgment; Tom and I have been good friends all the time, and when I saw that was on that deed and I didn't exactly know whether he understood that; and I was kind of anxious that he should; and of course when he told me that he understood it and understood what he was going to sign, that really cut no ice, but I wanted him to understand what was in the deed at the time I was reading this to him; do I know where the daughters were at that time? I believe they were further up in the store, further up towards the front of the store; we did the work at the back end of the store building, a building about a hundred feet long, and the girls were at the front I think; I have a desk, but I wouldn't be positive whether he was at the desk or at the counter at the office; we were outside the office part of the time and I wouldn't say whether I read it over to him in the office or at the outside; there was no one else, if I remember right, at the time of the reading; how was it when it came to the signing? Why, when it came to the signing, we went to the office, and Tom signed his name; the last part, if I remember, the two 'l's in Tom's name, the last part of 'Marshall' they were not legible; we couldn't hardly see them, and I said, 'Probably we had better fix that,' and if I remember right one of the daughters stepped up,—they were there when he signed, she said, 'Pa' or 'Father,' I don't remember what word was used, she said, 'I will fix it,' and I said, 'It will be more legible to extend that letter and make it more legible;' I think both of the 'l's' in the last part of the 'Marshall,' and she did it; I wouldn't be positive which one of the girls it was; Tom said, 'Yes, you can fix it,' and it was fixed in my presence; yes, sir, there by one of the daughters; I don't know how long they were there after the deed had been signed; I don't think very long; after he made his signature and after the

daughter had made this a more perfect 'l' I recollect his saying that it was all right, yes, sir.; I remarked that would be all right now; I sanctioned the girl's doing the work, and I remarked, 'That is all right;' I looked at it there. The signature otherwise would have been sufficient, but in order to have it more legible I suggested that, and this other suggestion was made at the time.

*On Cross-Examination.*

"I keep a record of the acknowledgments that I take, that the law requires me to keep; I haven't it with me; Mr. Marshall said he was perfectly willing to sign the deed; he made no objection that I heard; he came there for that purpose with his daughters; the talk between the daughters and Mr. Marshall, as I understood the affair, was that he came for that purpose; my opinion is that one of the daughters had the deed; I wouldn't say positively as to that, but my opinion is that she had the deed when they came in there; but they were all three there together, and all talking at the time with reference to this signature; I think there were just two of them besides Tom; as to where the deed was signed, I have just two points there, a desk and a counter; I am not positive where, but one place over there; it was signed there at the counter, in the office; I take Notary acknowledgments sometimes, a few yes; when was this matter first brought to my attention, after the acknowledgment was taken? The first time I heard of it was when I was first summoned to come as a witness in this case; up to that time I had not talked to any of these parties, not about this deed; we met and passed and re-passed, all of the parties; but when it comes to figuring right down on a conversation along the line of the deed I don't have any recollection of mentioning it; the next time I saw this deed was when I came down here, at the time when I first came down here; I don't remember now who it was showed it to me at that time; I saw it there in Mr. Hubbert's office; I went there for a talk, for he was the attorney; I didn't know what I was coming for.

"Did I read the deed over at that time in Hubbert's office? Well, I don't much believe I did at that time; the only thing I noticed about was my signature and that addition; when I did read the deed over, I read the description of the land and what was written in the deed, the entire deed; after I got through with the description, and Mr. Marshall made the remark, 'I know all about, that, there is no use reading it,' I read on down till I came to the final wind up of the deed; I read until he said he understood it, understood what that part was; but as to how he knew he made no statement, only that he was there to sign the deed. The girls made no statement, nothing only that they wanted the acknowledgment. When I started reading the deed his daughters were in the front part of the store; at the time of the signing that finished his signature, they were at the desk just like this; the daughters were both standing right there, and his signature was placed on the deed on the desk in the office. After the deed was signed and I put on my notary seal there was nothing done, only, if I remember right, right after this the girls bought some stuff up there, and maybe waited for Mr. Marshall in the store; that is my recollection, but nothing was said in relation to the deed after placing the seal on it. As to the name of Thomas Marshall, or unfinished signature, I think the two 'l's' didn't show; they looked like an 'e,' and they were just extended out.

"Q. Were those two letters added to this name by the daughters? A. Just extended out.

"Q. Look at the deed and state whether in your opinion there has not been three letters, "all" entirely added to the signature placed there by Mr. Marshall? A. I don't see that there was, because this 'l' was right there in connection with the 'a' at that time, and this other part —that is his signature there.

"Q. Is there any comparison between that 'a' and 'all?' A. No, not very much; my recollection is that there were just the two letters, the two 'l' only, extended up there.

"Q. There is just one thing that you remember, that you started to read this deed, or a part of it, and Mr. Marshall said he understood it? A. My memory is that I read it all except the last part of it; where it starts, 'To Have and to Hold,' that is where he stopped me, yes sir.

"Q. A while ago you were talking about a deed with a condition? A. What I mean is the condition or description of the land, and that is really a part of it.

"Q. That is the way I understood you on direct examination? A. Yes, sir, that part description here, being unusual, that is the reason I insisted that he be acquainted with it."

The foregoing testimony of Shelley is much more convincing on the question of fact to be determined in this case than is the testimony of the defendant himself, a portion of which, bearing on this question, we herein set out:

"Q. Isn't it a fact that that deed was read over in your presence and in your hearing? A. No, sir, there is a lie certainly in there; I deny that I read it or heard it read, yes, sir, I do; and nobody pretended to read it to me; nobody stated to me what it contained in the way of my interest in the estate, no, sir; neither one of my daughters, no sir; not the notary public, no, sir; he, the notary and I, were boys together; no one was present at the time I signed the deed but me and my daughters and him; I mean Mr. Shelley."

*On Cross-Examination:*

"At Rocky Comfort they brought the deed there; I never saw it before I got before Mr. Robert Shelley; he was standing right there behind the counter, and they told him what they wanted; I don't know whether I did or they; I don't know but what it was me; I don't know, I was flustrated; the only thing that I recollect, he asked me if it was all right, and my daughter picked up the pen and run my name on out; I said, 'all right, it is done now.'

"Q. Well, you told your daughter to make that 'l' clear, that you hadn't made it clear? A. No, she picked

up the pen and run it on out. That is the reason, I suppose, that he asked me if it was all right. He knew that she did it.

"Q. Isn't that true, that you told Mr. Shelley that you understood what was in that deed? A. No, sir, I don't know what I told him.

"Q. You don't know what you told him? A. No, sir, I was flustrated.

"Q. Were you drinking on that occasion? A. I don't know that I was.

"Q. If you had said anything of that sort you would know it? A. No, sir, I don't recollect. Everything is blank. I don't know anything about what was said when I went in there.

"Q. Did you have any talk with him about what you were going to sign or what was in that paper? A. No, sir, I don't know that I did.

"Q. Do you know that you didn't? A. I wouldn't be positive about that.

"Q. Isn't it a fact that he asked you what it was, and suggested something about reading it and you told him that you already understood what was in it? A. No, sir, I didn't tell him that.

"Q. And he told you that it was a little unusual, and that he actually did read it to you? A. He did not.

"Q. Didn't he read any part of it? A. If he did I don't recollect a thing about it.

"Q. And isn't it true, after he was nearly through reading it, and had read all the written part of it and the principal printed clauses of that deed, that then you spoke up and told him that you already understood it? A. No, sir.

"Q. Nothing of that sort? A. No, sir.

"Q. And you tell this court nobody ever undertook to tell you what was in it? A. No, sir, nobody ever did.

"Q. And you signed it without knowing what was in it? A. I didn't suppose there was anything except the description of the land, sir. I didn't suppose any-

body would be mean enough to try to mislead anybody.''

There being no attempt to show by the defendant that there was any special trust relation existing between Tom Marshall and his daughters with reference to the property involved, the burden rested upon the defendant to show by convincing proof that he had been fraudulently imposed on. A number of cases are cited by appellant to sustain this statement of the law, but we deem it necessary to cite only one Supreme Court case, which is Hamlet v. McMillin, 223 S. W. 1069.

That the right to the $400 allowance, the $600 allowance, and the $350 allowance for household goods, made by the probate court to the defendant as the surviving widower of Martha G. Marshall was subject to assignment has undoubtedly been decided in this State. [See McFarland et al. v. Baze, 24 Mo. 156. See, also, Jaeschke v. Reinders, 2 Mo. App. 212.] The right of these allowances accrued to the defendant Marshall on the death of his wife, and the language of the provision in the quitclaim deed in the case at bar is certainly as broad as was the conveyance in the McFarland case. The law governing cases of expectancy and reversionary interests, etc., cited by respondents, is inapplicable here, because under those conditions the right to the property had not accrued, while in the case at bar Marshall's right to what he is now claiming had accrued on the death of his wife long before the execution of the quitclaim deed, and in such instances, where the parties are under no special trust relation, where they are competent to make contracts such as were the parties in this case, there must be something more than inadequacy of consideration that will move a court of equity to set aside a solemnly executed deed. In fact at the time this deed was executed the defendant had a bequest given him under his wife's will. True, it was a small bequest, but it could well be argued that he preferred at that time to take the $400 which his daughters paid him, receive the interest in the fifteen acre tract which they deeded him, and receive

from the executor the $92 note which was turned over to him, rather than go into court and renounce his wife's last will and testament. In other words, the question of whether he would renounce the will or not might have entered into the agreement which he made with his children. If he made this agreement, and knew that the deed conveyed the interest which he is now seeking to obtain out of his deceased wife's estate, he will not now be heard to renounce that act because perchance he might fare better by taking the statutory allowances given a surviving widower. The evidence to our minds is convincing that this provision of the deed, which he now seeks to have set aside, was read over to him and explained to him by the Notary Public, Shelley, when it was executed. That being true, he cannot rely upon the ground that the instrument was procured by fraud because he did not know what was in the deed and was incapacitated so he could not find out what was in it but was relying on the word of the grantees therein.

For these reasons, we are constrained to hold that the decree entered by the trial court should be set aside and that a judgment be entered granting the relief prayed for in the petition and denying the affirmative relief sought in the answer. The judgment is, therefore, reversed and the cause remanded with directions to enter a judgment in accordance with the views herein expressed. *Cox, P. J.,* and *Bradley, J.,* concur.